IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | 1:03cr112 |
| | ) | |
| RUSSELL LEE EBERSOLE, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM OPINION

_____ Before the Court are <u>pro se</u> defendant Russell Lee Ebersole's

Motion for New Trial (docket #170), Motion for Bond Pending

Appeal (docket #171), Motion to Appoint Counsel (docket #172),

Supplement to Motion for New Trial (docket #180), Second

Supplement to Motion for New Trial and Order for the Government

to Produce Documents (docket #181), Motion to Unseal Documents

Disclosed Under Court Order to Produce <u>Brady</u> Materials (docket

#186), Third Supplement to Motion for New Trial (docket #202),

and Fourth Supplement to Motion for New Trial (docket #210).[1]

For the reasons stated below, Ebersole's Motion for New Trial, as

supplemented, and Motion to Unseal Documents Disclosed Under

---

[1] Also pending before the Court are Ebersole's Motion to
Vacate, Set Aside, or Correct Sentence of a Person in Federal
Custody pursuant to 28 U.S.C. § 2255 ("§ 2255 Motion") (docket
#207), which is a refiling of his original § 2255 Motion (docket
#191) that conforms to the E.D. Va. Loc. Civ. R. 7(F) page
limitation, and accompanying Motion for Discovery (docket #198),
and Motion for Interogatories [sic] and Production of Documents
(docket #218).  On October 25, 2006, the Court stayed the § 2255
Motion pending the resolution of Ebersole's direct appeals.
Because Ebersole's direct appeals of his conviction are now
exhausted, the Court will address these motions in a separate
opinion.

Court Order to Produce <u>Brady</u> Materials will be denied.   The
remaining motions will be denied as moot.

I.   Introduction

        The Fourth Circuit summarized the trial evidence and issues
in this case as follows:

> Ebersole was the president and director of a
> business called Detector Dogs Against Drugs and
> Explosives, Inc. ("Detector Dogs"), a privately held
> Maryland corporation. Detector Dogs trained dogs and
> their human handlers to find drugs and explosives, and
> then offered the services of the canine teams to
> customers. . . .
>     In the aftermath of the September 11, 2001
> terrorist attacks, federal agencies urgently sought the
> services of qualified explosive ordnance detection
> canine teams (sometimes referred to as "EOD canine
> teams" or "bomb-sniffing canine teams") for the
> protection of their employees and the public.  Among
> those agencies were the Department of State (the "State
> Department"), through its primary contractor, Intercon
> Security Services, Inc. ("Intercon"), for the State
> Department's Harry S Truman Building in Washington,
> D.C.; the Board of Governors of the Federal Reserve
> System (the "BOG-FED"), also for buildings in
> Washington; and the Internal Revenue Service (the
> "IRS"), through its primary contractor, Worldwide
> Security Services, Inc. ("Worldwide"), for the IRS
> service center in Fresno, California.  Ebersole sought
> to persuade those agencies to retain Detector Dogs's
> services based on a series of material
> misrepresentations that he made in written proposals
> and in fabricated examination, certification, and
> training curriculum documents.  The dogs on the
> Detector Dogs canine teams actually were poorly
> trained, and their human handlers lacked adequate
> knowledge and experience, all in contravention of
> government standards and requirements.  Detector Dogs
> initiated its services for the State Department on
> September 24, 2001.  Eventually doubting the competence
> of the Detector Dogs canine teams, the State Department
> arranged to have an odor recognition proficiency test
> administered to six of the dogs assigned to protect the
> Harry S Truman Building.  The test had been developed

2

earlier by the Bureau of Alcohol, Tobacco and Firearms (the "BATF") to determine by a standardized method whether a dog could successfully detect the odor of explosives. The test was given on April 22, 2002, at the BATF Canine Enforcement Training Academy in Front Royal, Virginia, to the dogs on the State Department job, all of which failed the test (with their Detector Dogs handlers participating). Immediately thereafter, Intercon terminated its subcontract with Detector Dogs for the provision of EOD canine teams to the State Department.

United States v. Ebersole, 411 F.3d 517, 521 (4th Cir. 2005) (footnote omitted).

In addition to the test conducted on April 22, 2002, which is the focus of Ebersole's Motion for New Trial, the government presented evidence during the trial of five other explosives detection tests. On April 4, 2002, a covert on-site test was performed at the BOG-FED buildings in Washington, D.C. Three Detector Dogs canine teams failed to detect the presence of fifty pounds of trenchrite 5 dynamite, fifty pounds of TNT, and fifteen pounds of the plastic explosive C-4 contained in three separate unmarked vehicles that were allowed to enter a BOG-FED parking garage. Additionally, on March 19, 25, and 26, and April 29, 2002, Detector Dogs teams failed tests involving odor detection of hidden explosives at the IRS-Fresno service center.

In addition to the failed tests, evidence presented at trial demonstrated that the dogs on the Detector Dogs canine teams were poorly trained and that their human handlers lacked the requisite knowledge and experience, all in contravention of government

3

requirements and Ebersole's own representations to the

government.  The Fourth Circuit highlighted some of this evidence

as follows:

> For example, a former Detector Dogs employee testified
> that, in March 2002, she had assisted Ebersole in
> creating test results and certifications (dated as far
> back as 1997) for dogs designated for the IRS
> assignment, and that Ebersole had embellished the
> resumes of their handlers, adding false information
> such as that one handler had "[a]ssisted the Secret
> Service on security missions for the [P]resident of the
> United States and foreign dignitaries."  Another former
> Detector Dogs employee testified that she was a
> 19-year-old kennel hand when Ebersole directed her to
> serve as a handler at the BOG-FED facilities; she
> stated that, "if a dog would have hit on something, I
> never knew who to call, what to do, what I was supposed
> to do exactly."  The trial evidence also showed that
> Ebersole utilized forged certificates proclaiming him
> to be a certified instructor of handlers of
> bomb-sniffing dogs, and a document purporting to set
> forth Detector Dogs's training curriculum (a program
> running 303.5 hours in length).  However, handlers
> testified that they trained for no more than a fraction
> of that time before being posted with the federal
> agencies, which had been told by Ebersole in written
> proposals that the handlers were seasoned canine team
> veterans with more than twenty years of experience.
> Witnesses also contradicted other claims made in the
> written proposals, including that several Detector
> Dogs's employees were nationally certified trainers and
> judges with the United States Police Canine Association
> and the North American Police Work Dog Association, and
> that Virginia's Department of Criminal Justice Services
> had approved Detector Dogs's training procedures and
> certified its handlers.

Id. at 521 n. 1.

II.  Procedural Background

A grand jury returned an indictment against Ebersole on

March 13, 2003, charging him with twenty-six counts of wire fraud

and two counts of presenting false claims to the government, in violation of 18 U.S.C. §§ 1343 and 287, respectively.  The indictment generally alleged that Ebersole had devised a scheme to obtain money from the federal agencies by inducing them—by means of false and fraudulent pretenses, representations, and promises—to use his Detector Dogs's explosives detection services.

Ebersole's trial began on June 9, 2003.  On June 20, 2003, a jury convicted Ebersole of twenty-five counts of wire fraud[2] and two counts of presenting false claims to the government.  On September 8, 2003, Ebersole was sentenced to a total of seventy-eight months imprisonment, among other sanctions.  Ebersole appealed his convictions and sentence to the Fourth Circuit, which upheld the convictions, but remanded the case for re-sentencing in light of United States v. Booker, 543 U.S. 220 (2003).  Ebersole, 411 F.3d 517, cert. denied, 126 S. Ct. 1142 (2006).  Upon remand, the Court sentenced Ebersole to a term of imprisonment of sixty-three months.  Ebersole filed the instant Motion for New Trial on December 22, 2005, while simultaneously appealing his new sentence.[3]  The re-sentencing was affirmed on

---

[2] The government had previously withdrawn the other wire fraud count.

[3] Accompanying his Motion for New Trial, Ebersole also filed a Motion for Bond Pending Appeal (docket #171) and Motion to Appoint Counsel (docket #172).  Because Ebersole's re-sentencing has since been affirmed, United States v. Ebersole, 189 Fed.

July 13, 2006.  <u>United States v. Ebersole</u>, 189 Fed. Appx. 287

(4th Cir. 2006).[4]

Since he filed his Motion for New Trial, Ebersole has filed

four supplemental motions, each essentially raising one issue:

the propriety of the April 22, 2002, test conducted by Richard

Strobel, Chief of the Arson and Explosives Section of the BATF.[5]

Specifically, he argues that the newly discovered evidence, which

he obtained from various Freedom of Information Act ("FOIA")

requests, demonstrates that the test was improperly conducted and

overly stringent, that the BATF interfered with his contracts in

an attempt to supplant his company as a federal contractor, and

---

Appx. 287 (4th Cir. 2006), the motions will be denied as moot.

[4] A petition for rehearing was denied and the mandate issued on November 8, 2006.

[5] Although Ebersole's arguments are focused mainly on the integrity of the April 22, 2002, test, he purports to present five separate reasons why a new trial should be awarded: (1) documents he received subsequent to trial provide exculpatory information and have impeachment value; (2) the new evidence proves that the indictment was broadened at trial to such an extent as to constitute a variance worthy of reversal pursuant to <u>United States v. Russell</u>, 171 F.3d 195 (4th Cir. 2003); (3) the new evidence demonstrates that the test conducted on April 22, 2002, by the BATF was not a "functional equivalent;" (4) the new evidence demonstrates the level of interference by the BATF was beyond that presented at trial, resulting in the violation of his right to due process; and (5) the newly discovered evidence provides ample support for Ebersole's continued requests to receive further information from the government.  Because many of these arguments are also presented in Ebersole's § 2255 Motion, and are more appropriately addressed in such a motion, this opinion will only address those arguments that relate to the newly discovered evidence.

that he was not afforded the right to confront at trial certain individuals involved in the investigation of his business.

On March 8, 2006, Ebersole filed a Supplement to Motion for New Trial.  This supplement attached a letter from the BATF, sent in response to Ebersole's FOIA request for "logs, control records, or magazine summary sheets" concerning the testing of Ebersole's or any other canines.  In that letter the BATF stated that it did not locate any of the requested information for the dates specified and went on to state that even if Ebersole requested information "detailing the use of explosives for not only canine testing but training as well," that "information would be withholdable under the FOIA exemption (b)(2)."  Ebersole argues that this demonstrates that material evidence was available concerning the April 22 test, requiring reversal of his conviction.

On April 19, 2006, Ebersole filed his Second Supplement to Motion for New Trial and Order for the Government to Produce Documents.  This supplement attached a letter from the Department of Justice, Office of Information and Privacy ("DOJ/OIP") upholding the BATF's decision under FOIA to withhold certain information, based on 5 U.S.C. §§ 552(b)(5) and (b)(6), because the information involved either communications protected by the attorney work-product privilege or material that constitutes a clearly unwarranted invasion of the personal privacy of third

parties.  Ebersole has requested that the Court order the government to produce all relevant documents.  The government has responded that the Court lacks subject matter jurisdiction to review the decision of the DOJ/OIP, which Ebersole must pursue in the district court having jurisdiction over the FOIA requests. Nevertheless, the government submitted the withheld documents under seal to the Court for ex parte review to enable the Court to determine if any materials should be disclosed under Brady v. Maryland, 373 U.S. 83 (1963).  On May 24, 2006, Ebersole filed a Motion to Unseal Documents Disclosed Under Court Order to Produce Brady Materials.  On May 30, 2006, after finding that nothing disclosed by the government constituted Brady materials and that revealing the requested information would circumvent existing FOIA procedures, the Court granted the government's request to keep the documents under seal.

On August 14, 2006, Ebersole filed his Third Supplement to Motion for New Trial.  This supplement appears to be another request to unseal the documents presented by the government. Ebersole argues that the brief explanation provided by the government as to the documents' contents proves that the April 22, 2002, test was conducted using an overly stringent standard.

On September 8, 2006, Ebersole filed his Fourth Supplement to Motion for New Trial.  This supplement refers to two documents Ebersole sought under the FOIA from the Department of State,

Office of Diplomatic Security, which were withheld under 5 U.S.C.
§ 552(b)(5).  Ebersole argues that these documents should be
disclosed to the Court for an <u>in camera</u> review as part of the
Court's <u>Brady</u> investigation.  Because there is no merit to
Ebersole's continued assault on the testing of his dogs, this
request will be denied.

III. Discussion

      All the post-trial motions at issue in this opinion address
either Ebersole's frustration with various government agencies'
refusal to produce documents he has requested under the FOIA, his
concerns with the way in which the April 22, 2002, test was
administered, and his argument that the documents that have been
produced constitute newly discovered evidence entitling him to a
new trial.

      Fed. R. Crim. P. 33 provides that "[u]pon the defendant's
motion, the court may vacate any judgment and grant a new trial
if the interest of justice so requires."  A motion for a new
trial based on newly discovered evidence must be filed within
three years after the verdict is rendered.  A motion based on any
other reason must be filed within seven days of the verdict.  <u>Id.</u>
Ebersole's motion, to the extent that it is based on a claim of
newly discovered evidence, is timely.

      The Fourth Circuit utilizes a five-part test to determine

whether a new trial should be granted under Rule 33 for newly
discovered evidence:

> (a) the evidence must be, in fact, newly discovered,
> i.e., discovered since the trial; (b) facts must be
> alleged from which the court may infer diligence on the
> part of the movant; (c) the evidence relied on must not
> be merely cumulative or impeaching; (d) it must be
> material to the issues involved; and (e) it must be
> such, and of such nature, as that, on a new trial, the
> newly discovered evidence would probably produce an
> acquittal.

United States v. Fulcher, 250 F.3d 244, 249 (4th Cir. 2001)

(citing United States v. Custis, 988 F.2d 1355, 1359 (4th Cir.

1989)).

A court "'should exercise its discretion to grant a new

trial sparingly,' and it should do so 'only when the evidence

weighs heavily against the verdict.'" United States v. Perry, 335

F.3d 316, 320 (4th Cir. 2003) (quoting Unites States v. Wilson,

118 F.3d 228, 237 (4th Cir. 1997)).  As discussed below, Ebersole

fails to satisfy these elements.

## A.

In early 2002 an investigation began concerning the

reliability and performance of the Detector Dogs canine teams who

were working at the State Department.  In an effort to have these

suspicions either confirmed or denied, the government decided to

administer an odor recognition proficiency test to the six

Detector Dogs canine teams that worked at the Harry S Truman

building in Washington, D.C.  The test was conducted at the BATF

Canine Enforcement Training Academy, in Front Royal, Virginia.
The test that was supposed to be conducted was known as the
Department of the Treasury Odor Recognition Proficiency Test for
Explosives Detection Canines ("Treasury Test").

The Treasury Test has numerous explicit requirements.  For
example, it calls for the use of a quantity of explosives
weighing from fifteen grams up to one-quarter of a pound, with
dynamite not to exceed one-half of a pound.  The method in which
the explosives are set out is also important.  The Treasury Test
provides, <u>inter</u> <u>alia</u>:

> Ten different explosives will be utilized, including
> six mandatory explosives and four elective explosives.
> . . . Each agency will select four elective explosives
> from the list of electives, based on its assessment of
> the threats it is most likely to encounter.
>
> Thirty sample containers will be prepared as described.
> Ten of these sample containers will contain the six
> mandatory and four elective explosives samples.
> Fifteen of the remaining sample containers will be
> filled with different distracters, and the remaining
> five sample containers will be empty.
>
> The sample containers will be spaced a minimum of 4
> feet apart.  The 10 explosives will be placed randomly
> among the 20 other containers.  The test administrator
> will select the overall arrangement of the sample
> containers.  Examples of arrangements include
> individual lines of 10 or fewer containers or circular
> configurations of 10 or fewer containers.
>
> To allow for sufficient odor availability, the sample
> containers must be in place for a minimum of 15 minutes
> prior to testing.
>
> Certain environmental factors (*e.g., temperature and
> humidity*) influence the vapor pressure of explosives.
> Therefore, the test should be administered in an area

11

> where the ventilation and conditions are consistent
> with the normal working environment of the canine.
> Additionally, it is recommended that the following
> parameters for each test be recorded: time of day,
> temperature, weather conditions, quantity of each
> explosives sample, and amount of time between the
> placement of the last test sample and the start of the
> testing process *(set time)*.

Motion for New Trial, Ex. 6 at 2.  To pass the Treasury Test, the canine team must make positive responses on all ten explosive odors.  The canine team fails the test if any explosive sample is missed, or if more than two positive responses are made on non-explosive samples (a "false positive").

In addition to the Treasury Test, the BATF conducts its own, more stringent, test on the canine teams it trains at the Front Royal facility.  To pass the BATF Test, among other requirements, canine teams must certify on a minimum of twenty different explosive compounds in varying weights, from two to twenty grams.

On April 22, 2002, BATF Forensic Chemist Richard Strobel, with the aid of fellow BATF personnel, tested six Detector Dogs canine teams.  Strobel testified at trial, with the aid of his own April 26, 2002, memorandum outlining the test results, that ten explosives were used for each dog.  In total, forty-four of the sixty explosives utilized in the test were missed by the six dogs, with three canine teams failing to alert on all ten of the explosive samples.  One particular dog was observed to sample the dynamite six times without an alert.  Moreover, there were a total of forty false positives.  These results led Strobel to

conclude that the canine teams failed the test by "a substantial margin."

On cross-examination, however, Strobel testified that, notwithstanding the clear procedures set forth for conducting the Treasury Test, the test actually given to the Detector Dogs canine teams was a hybrid test, utilizing components of both the Treasury Test and the more demanding BATF test, and in some instances was even more stringent than the BATF test.  Strobel testified that although he had conducted over 300 odor recognition tests before testing the Detector Dogs canines, the test performed on April 22, 2002, was the first and only time that he had performed a test on privately owned dogs.  Thus, contrary to the set up outlined by the Treasury Test, the test actually given utilized ten explosive samples and thirty distracter odors, and failed to leave any sniffer tins empty.

Moreover, Strobel testified that he did not weigh the explosives, but relied on his extensive past experience conducting the BATF Test to determine the correct amount of explosive material to place in the sniffer tins.  For example, Strobel testified that "a lightweight powder like red dot power would fill the sniffer tin to about three-quarters of its 2-ounce capacity.  A more dense powder, like, say, black powder, would take up one-third to one-half of a sample container."  Tr. at 379.  Further cross-examination revealed that on three occasions

within the test Strobel used "lesser quantities than were specified" by the Treasury Test, and "less than a gram" of dynamite was used.  Tr. at 375.

Although Strobel's testimony cast some doubt on the administration of the Treasury Test, it is undisputed that five of the six canines had more than two false positives, which by itself is grounds for failure.  For example, a German Shepard named Inga had thirteen false positives and missed eight of the ten explosives.  Motion for New Trial, Ex. 8.  Given this evidence of false positives, any defects in how Strobel handled the explosives would not have made any material difference.  Moreover, Strobel testified that the red dot powder explosive was measured in the amount specified by the parameters of the Treasury Test, and five of the six canines failed to alert to the presence of that explosive.  The one dog that did alert to the red dot explosive also had more than two false positives.  As the overwhelming evidence established, all six of the canines tested on April 22, 2002, failed a test that was functionally equivalent to the Treasury Test.

<u>B.</u>

Ebersole attacks the April 22, 2002, test on numerous grounds, none of which, either independently or cumulatively, undermine the jury's verdict.

Ebersole argues that FOIA Document 42 demonstrates that the

14

BATF had a conflict of interest when it tested the Detector Dogs canine teams because it was in fact attempting to supplant Ebersole's business as a State Department contractor. In addition, he argues that the document identifies two individuals who were involved in the investigation of his business, however, these persons were not called as witnesses at trial, thereby denying him the right to confront them. Contrary to Ebersole's view of the significance of this document, the Court finds it to have little probative value to Ebersole's case. The document is simply a handwritten note from within the State Department that discusses the possibility of utilizing BATF trained dogs at State Department facilities and quotes prices for the dogs and their training. Moreover, the document is dated May 29, 2002, after Ebersole's contract with the State Department was terminated, and does not mention Ebersole in any manner.[6]

Ebersole's argument that he was denied the right to confront witnesses against him is equally flawed. The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." Only statements that

---

[6] Ebersole also relies on a FOIA document he received in 2005, showing that in March 2002, before the Detector Dogs contract was cancelled, the BATF communicated with the BOG-FED about bomb-sniffing canine teams provided by the BATF. Motion for New Trial, Ex. 22. These contacts simply do not establish sufficient evidence of a conflict of interest to undermine the verdict.

are "testimonial" in nature are the object of the Confrontation Clause. <u>United States v. Iskander</u>, 407 F.3d 232, 240 (4th Cir. 2005) (citing <u>Crawford v. Washington</u>, 541 U.S. 36, 68-9 (2004)). "Testimonial" evidence "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." <u>Crawford</u>, 541 U.S. at 68. FOIA Document 42, however, is not testimonial in nature. The author in no way provided any evidence against Ebersole. Put simply, the document is not germane to the issues and thus not subject to the Confrontation Clause.

Ebersole makes similar Confrontation Clause and conflict of interest arguments based on FOIA Document 45, which is an internal State Department memorandum from Don Blake to Alan Bigler and purportedly forwarded to Bill Simms,[7] in which Blake requests that the BATF administer the Treasury Test to Ebersole's Detector Dogs. Contrary to Ebersole's assertions that the document somehow shows that members of the State Department and the BATF were working covertly to supplant his company, or that it demonstrates that the BATF knew exactly what test it was being asked to administer, the document is merely cumulative of previously introduced evidence. As the record shows, Strobel's failure to conduct an exact replica of the Treasury Test was

---

[7] Simms was the point of contact within the State Department who was coordinating with Robert Noll at the BATF.

probed ad nauseam at trial, and considered by the Fourth Circuit
when it affirmed Ebersole's conviction.  Ebersole, 411 F.3d at
533 n. 16.  Moreover, as previously discussed, the right to
confront witnesses does not apply to persons involved in the
investigative process whose testimonial statements were not used
at trial.

Ebersole argues that FOIA Document 50 proves that certain
members of the government committed perjury.  FOIA Document 50 is
an internal State Department e-mail, sent at 7:44 A.M. on April
18, 2002, which memorializes a telephone conversation between
George Bailey and Robert Noll, in which Bailey states that the
test to be conducted on April 22, 2002, would most likely take
four to five hours and that a 10:00 A.M. start time would be best
for all parties involved.  This is not newly discovered evidence
because a copy of that e-mail was provided to Ebersole as part of
the government's trial disclosures.

Moreover, the document does not provide any additional
insight into the timetable of events on the test day.  Ebersole
argues that the e-mail demonstrates that the test began at 10:00
A.M.  If this is the case, Ebersole argues, the explosives would
have been left out for an extended period of time, thereby
allowing a longer than standard set-off time,[8] which would

---

[8] Testimony at trial demonstrated that set-off times were
usually between fifteen minutes and one hour.  Tr. at 405.

ultimately result in the explosives' odor being undetectable by the time the canines performed the test.  At trial, however, Ebersole himself testified that he believed that he did not take the test until 2:00 - 2:30 P.M.  He further testified that in his opinion, the explosive sample for red dot gun powder would have evaporated by this time.  He testified that,

> So when again I looked at the explosives sitting in the cans for what I deemed to be, in my opinion, an excessive amount of time, again, it is my belief that the nitroglycerin had evaporated.  If I compare that to the way we do it, we actually will keep this closed up until the point in time we're actually ready to run the dog around the equipment and we pop the cap.  So we will actually have a minimal amount of set time for dynamite.

Tr. at 1609-1610.  As this quote establishes, the argument concerning the amount of set-off time and whether that time was appropriate was a matter considered, and rejected, by the jury.[9]

Finally, Ebersole points to another FOIA document, Task No. ATA-ATF 152, from the State Department, which he argues

---

[9] Ebersole prepared and included a "Mass Transport Diffusivity Analysis" with his Motion for New Trial.  He submitted a revised version of this document on December 18, 2006.  Both of these documents argue that there is a threshold level below which canines are not capable of detecting the presence of odor and that the test conducted on April 22, 2002, fell far below this minimum level, thereby invalidating the results.  However, these documents were prepared by Ebersole himself, who was not offered as, nor is he qualified to be, an expert witness in the area of explosives or chemistry.  Thus, his testimony, and the findings of these "Mass Transport Diffusivity Analyses," are the opinions of a lay person and not an expert.  Moreover, as discussed above, none of Ebersole's complaints and evidence about the problems with the April 22, 2002, test explains why the dogs made so many false positive alerts.

demonstrates that Robert Noll was involved in attempts to
supplant his company's contract well before March 20, 2002.
Motion for New Trial, Ex. 16.  However, Noll's name does not
appear anywhere in the document at issue.  Furthermore, the
document is merely the administrative means by which the State
Department was able to utilize the services of the BATF testing
experts and facilities, by setting forth the funding for the
examination of Ebersole's canine teams using the Treasury Test
and outlining the general parameters under which the BATF, at the
request of the State Department, was to undertake the testing.
Indeed, it is unlikely this evidence would have produced an
acquittal if it were introduced in a new trial.

Each of the foregoing six documents merely establish two of
the five prongs required by Fulcher.  The documents are, with the
exception of FOIA Document 50, newly discovered.  In addition,
the sheer volume of FOIA documents requested by Ebersole
demonstrates his diligence in obtaining this information.
However, the information supplied in these documents is either
largely cumulative of issues fully probed at trial or immaterial.

Furthermore, none of the evidence, individually or
collectively, is of such a nature that it would be likely to
produce an acquittal upon a new trial because this evidence only
deals with one portion of the trial evidence presented against
Ebersole.  Ebersole's argument that the test conducted was not a

19

"hybrid" of the Treasury Test and the BATF Test, and was therefore not a functional equivalent, misses the point. Even if the test conducted by Strobel utilized explosives in weights less than the BATF Test's more stringent standards, it does not explain why five of the six dogs tested had such large numbers of false positive alerts. Nor does it explain why many of the canines did not alert to the explosives that contained the correct amount of red dot powder. Moreover, it completely fails to explain the mountain of evidence against Ebersole that had nothing to do with the April 22, 2002, test. In short, this evidence would have been merely cumulative and would not probably produce acquittal because Ebersole has made no attempt to explain or contradict any of the other evidence, some of which was cited by the Fourth Circuit in its opinion, that supported his conviction. The newly discovered materials do not in any respect undermine the jury's verdict.

## IV. Conclusion

For the above stated reasons, Ebersole's Motion for New Trial (docket #170), Supplement to Motion for New Trial (docket #180), Second Supplement to Motion for New Trial and Order for the Government to Produce Documents (docket #181), Motion to Unseal Documents Disclosed Under Court Order to Produce Brady Materials (docket #186), Third Supplement to Motion for New Trial (docket #202), and Fourth Supplement to Motion for New Trial

(docket #210) will be denied.  The Motion for Bond Pending Appeal (docket #171) and Motion to Appoint Counsel (docket #172) will be denied as moot.

An appropriate Order will be issued with this Memorandum Opinion.

Entered this 25th day of January, 2007.

/s/
_____
Leonie M. Brinkema
United States District Judge

Alexandria, Virginia